## PLYMPTON.

Where an election was controverted, on the ground, that previous to the balloting, at which it took place, a motion was seasonably made and seconded, not to send a representative, which motion the selectmen refused to put, but proceeded with the election ; and the committee on elections reported thereon, that upon the evidence the motion was seasonably made, and not being put by the selectmen, the election subsequently effected was void. A minority of the committee submitted a report, concluding that the motion was not seasonably made, but that if it were, the election ought not to be thereby rendered void ; and, consequently, that the petitioners should have leave to withdraw their petition. The house amended the report of the committee by substituting, for the conclusion thereof, the conclusion submitted by the minority ; and the report, as amended, was agreed to.

THE election of Joseph B. Nye, returned a member from the town of Plympton, was controverted by Thomas E. Loring and others, on the ground, that at the meeting for the election, which was on the day of the general election, November 11th, 1850, before proceeding to the balloting, at which the sitting member was elected, a motion, made by the first named petitioner, was seasonably made, not to send a representative, which motion the selectmen refused to put, but proceeded with the balloting, which terminated in the election of the member returned.

The committee on elections, to whom the case was referred, received the testimony of several witnesses, adduced by the parties as to the time when the motion not to send was made. The committee reported the same, in detail, together with the following :—

" The committee find, that the warrant for the town-meeting, held in Plympton, November 11th, 1850, was duly signed by the selectmen of said town, and that legal notice was given of the meeting ; and that the only article in the warrant, in relation to the choice of a representative from said town, is as follows, to wit : ' Also, to bring in their votes for a representative to represent them in the general court, to be holden in Boston on the first Wednesday of January next.' A part of the record of said meeting is as follows, to wit : ' After that the selectmen declared the number of votes given for each person voted for, and that there was no choice of a representative

to said general court, a motion was made to adjourn the meeting, and it was voted not to adjourn. Then a motion was made to dissolve the meeting; but as the votes given in for governor, &c., had not yet been declared, and, of course, as a vote to dissolve the meeting would render the votes given in for governor, &c., illegal, the selectmen refused to call the vote. After the motion to dissolve the meeting was made, and the selectmen refused to call a vote to dissolve, a motion was made not to send a representative to the general court of Massachusetts; but as there was no article in the warrant for the meeting, that the subject matter thereof authorized such a vote, and, of course, such a vote would be illegal, the selectmen refused to call a vote not to send a representative, but called for the votes for a second time, voting for a representative to represent said town in the general court of Massachusetts, for the year 1851."

The committee concluded their report with the statement, that in the opinion of a majority of them, upon the evidence, the motion in question was seasonably and properly made, and should have been put by the selectmen, and not having been so put, the election subsequently effected was void.

This report, which was made on the 30th of January, was afterwards recommitted to the committee on elections, with instructions to report the conclusions of fact and the legal principles, on which they predicated their opinion above stated, that the election was void. They were also directed to receive any further evidence, which might be offered by either party, and were authorized to send for persons and papers.

In pursuance of the recommitment, the committee examined a great number of witnesses produced by the respective parties, whose testimony was reported at length. The committee then proceed as follows :—

" And, now, from this great mass of testimony, taken in connection with that given at the former hearing, the committee are directed, by the order of recommitment, ' to report the conclusions of fact and legal principles on which they ground their opinion.'

The principles of our institutions, and the form of government under which we live, unquestionably confer the privilege, and make it the duty of the respective towns in this commonwealth, to be represented in our legislative assemblies; and no slight cause in form, or even substance, ought to deprive a town of that privilege, when such town has manifested a desire and determination to be so represented. But on the other hand, it must be considered, that the efficacy of our laws, the preservation of our institutions, and the peace and quietness of the community, absolutely require that the selection of the law-makers should be subject to certain fixed and satisfactory regulations, which shall give a free, full and fair expression of the wishes of the voters. And the judges of our supreme judicial court, being called upon for that purpose, have given their opinion upon the construction of the constitution and laws, which should govern the presiding officers in town-meetings, in a case like the one now under consideration. In the 15th volume of Mass. Reports, page 537, (*ante*, 199,) they say, ' that a right to send a representative is a corporate right, vested in the several towns by the constitution, and can be exercised by them only in a corporate capacity; and it necessarily follows, that when a town is legally assembled for the purpose of electing a representative, if a vote pass not to send, the minority, dissenting, cannot legally proceed in the choice.'

Here the rule is clearly laid down, that towns have the constitutional right to vote not to send a representative; and the committee are of opinion, that for good and sound reasons this rule ought to be sacredly observed; and consequently it follows, irresistibly, that if a town have this constitutional right to vote not to send a representative, when a motion is regularly made not to send one, it is a legitimate motion, and it is the imperious duty of the presiding officer to entertain it, and to submit it to the decision of the meeting.

The decision aforesaid of our supreme judicial court is of long standing, and has been observed and conformed to by successive legislatures ever since its promulgation. And the committee cannot presume, that there will be any serious ob-

jection to it as a governing principle, by which we ought to be directed in deciding the present case.

The next question to be considered is, whether, when a motion is seasonably and properly made, not to send a representative, and the presiding officer refuses to put the motion, it vitiates and renders void an election subsequently made. The only difficulty which occurs to the committee, in the way of a ready answer to this question, is, that it is uncertain whether a majority of the legal voters are or are not in favor of the motion. And it can be said with some degree of plausibility, that inasmuch as the wishes of the majority have not been ascertained, and by a subsequent act a representative has been chosen, it must be presumed that a majority were in favor of sending. But it must be considered, that in reaching such a result, the constitutional rights of the qualified voters have been violated, in the presiding officer's refusing to submit to them a legitimate motion. And an act, based upon this violation, can hardly be considered legal. And again; it is very far from a certainty, that a majority were opposed to the motion, merely because, after being deprived of a constitutional right and privilege, enough of the voters tamely submitted, to carry out the illegal determination of the presiding officer. And the committee are of opinion, that if the presiding officer at the election, now under consideration, did wilfully refuse to put the motion not to send a representative, the same being seasonably and properly made, it was an illegal act, which vitiated and rendered void the election subsequently made.

They are supported and confirmed in this opinion by a series of decisions, heretofore made by the house of representatives in analogous cases; and would refer to the several cases of Westminster, (*ante*, page 32,) Nantucket and Sharon, (195,) Roxbury, (157,) Winslow, (201,) Southbridge, (215,) Boston, (221,) Charlestown, (226); and also the case of the town of Adams, (*ante*, 339,) where the chairman refused to put a motion to adjourn, and it was decided, that such a refusal vitiated an election subsequently made.[1]

---

[1] This is a mistake; the committee in that case reported against the election; but the house rejected the report.

The committee then proceeded to inquire, whether the motion of Mr. Loring was properly and seasonably made. There seems to be no doubt but that it was properly made so far as this; that it was made audibly, was heard by the chairman, and was seconded. And the great question, and substantially the only one, to be decided in this case, is, as the committee think, was the said motion made seasonably, at a proper time to be entertained and acted upon in the meeting?

The doubt, which existed in some minds at the meeting, as testified of, and which was suggested in this house, at the former debate upon this subject, whether such a motion could legally be made and entertained, after the meeting had been opened, and the voting had begun upon the first ballot, seems to the committee to be utterly unfounded. It is entirely contrary to the uniform practice in all our towns, and in many instances, would place town-meetings in a singular predicament. Most of the towns are desirous of being represented, and entertain sanguine expectations of being able to elect. They go into the election to accomplish the object, but after balloting a reasonable number of times, they become satisfied that it is impossible to concentrate a majority of voters upon any single candidate. Can it be contended that they are obliged, without hope, to continue the fruitless struggle *ad infinitum?* Besides, to dissolve the meeting would frequently destroy others of its objects. The committee do not feel inclined to waste any more time or words upon such a question. The material question is,—was Mr. Loring's motion not to send a representative made seasonably, in regard to the proceedings of the meeting, at the time it was made? Was it made before the voting had really and substantially commenced upon the second ballot, in which the sitting member was elected? If it was so made, then Mr. Nye was illegally elected. But if it was not made until that balloting had palpably and intentionally commenced, then the petitioners have not made out their case.

One thing appears very evident, and ought to be kept constantly in mind, throughout the whole investigation of the tes-

timony relative to this point, namely, that at the time of the meeting, and amongst all the discussion and controversy about this matter, then and there, not one word, nor, so far as appears from the testimony, one thought, was entertained, or uttered, that the motion was out of order, because the balloting had commenced. Other reasons were assigned, such as that it ought to have been made at the commencement of the meeting, and that it was not authorized by the wording of the warrant, &c. But this objection was not interposed. The record made by the town clerk on the spot, and at the moment, is of great importance, and is full of meaning upon this point. It reads as follows : 'A motion was made not to send a representative to the general court of Massachusetts, but as there was no article in the warrant for the meeting, that the subject matter thereof authorized such a vote, and of course such a vote would be illegal, the selectmen refused to call a vote not to send a representative ; but called for the votes for a second time.' It can be hardly doubted, but that the reason assigned, and the only reason upon which the selectmen acted, is truly assigned in the record. And it is equally strange and unaccountable, if the second balloting had really and openly commenced before the motion was made, that so palpable and cogent a reason and ground for a refusal as this would afford had not been mentioned or even thought of.

The committee are fully aware, that the testimony above set forth is very conflicting upon the point of precedence between the commencement of the second balloting and Mr. Loring's motion ; but they would suggest whether this state of affairs has not arisen in a great measure by mistakes in recollection. No doubt that all testify as they now really believe, but it is after a lapse of considerable time ; when partizans have grown warm, and a new and unexpected point has arisen ; when the mind, heated by party feeling, and rendered susceptible of receiving almost any bias, is called upon to recollect accurately the order of proceedings in one particular, which had not been called to the attention of any one before. In a case of controverted facts, where the testimony relates to trans-

78

actions which took place at a previous time, somewhat remote, great reliance ought to be placed upon the testimony of those, who, from their situation and interest in the matter, would be most likely to remember distinctly the order of events on the occasion. Now the chairman of the selectmen, who presided at that meeting, certainly ought to know what took place, and he states positively that Mr. Loring's motion was made, and heard by him, and talked about, before he received, or intended to receive, any votes on the second ballot; and he further states, that no one received or pretended to receive, with his knowledge or consent, any votes on that ballot besides himself; that if any votes got into the box, they got there without his knowledge or consent; because he did not intend to open the poll, or receive votes, until the question of Mr. Loring's motion was settled. And the decision and course of proceedings of the chairman of the selectmen is binding upon the other members of the board, unless dissented from at the time.[1]

Then again, Mr. Loring himself, who had been requested to make the motion, before the result of the first ballot was known, if it turned out to be no choice, and was waiting attentively for the declaration of the result, that he might immediately make his motion, would be very likely to remember how and when he made it. In connection with this, must be taken into consideration the testimony of Samuel Bradford, who had no desire to prevent the election of a representative, but says he wanted to send. He testifies that he was anxious to make a motion to adjourn, and meant to make it immediately after the declaration of no choice should be made; but that Mr. Loring was quicker than he could be, and succeeded in getting his motion made first. Now these witnesses, together with others similarly situated, being particularly interested in regard to the point of time when the motion was made, would be very likely to recollect it accurately.

It would be tedious and perhaps of little use, to go into a particular analysis of all the testimony bearing upon this question. A majority of the committee think that it strongly

---

[1] See the case of Charlestown, *ante*, 226.

preponderates in favor of the cause of the petitioners. And they firmly believe, that most if not all the testimony given upon the other side, and which apparently conflicts with such a conclusion, may be reconciled therewith, upon the presumption that Mr. Loring's motion, when first made and seconded, was not heard by those who give precedence to the commencement of the balloting, and that their attention to his motion was first called to it, when he urged or repeated it the second or third time.

The committee are of the further opinion, that if the chairman did call for votes immediately after the declaration of no choice, and thereupon and forthwith, Mr. Loring made his motion; it was the duty of the chairman to have suspended or revoked his call, so that a fair and reasonable opportunity could have been given for discussion, and the decision of the meeting thereon.[1]

A majority of the committee are therefore of opinion, that Mr. Loring's motion was a proper and legal motion, although not expressly, in so many words, written in the warrant; that it was made and seconded in due season; that a suitable and reasonable time ought to have been afforded for its discussion and decision, before proceeding to ballot the second time; that as the presiding officer at the meeting refused to entertain this motion, the subsequent proceedings in electing a representative were illegal and void, and that the sitting member from Plympton is not entitled to a seat in this house."

Two members of the committee, (Messrs. *Schouler* and *Story*,) dissented from the conclusions both of fact and law stated in the report, and presented their views thereon as follows:—

" The evidence in this case is exceedingly voluminous and contradictory. It is difficult to say, exactly, what it proves or disproves, in regard to the points at issue. The undersigned will, however, endeavor to state, as clearly and concisely as may be, what appears to their minds to be its fair result.

The certificate of the member is good *prima facie* evidence,

[1] See the case of Charlestown, *ante,* 226, and the case of Boston, 221, to this point.

that he is entitled to his seat, and the burden is on the petitioners to show, affirmatively, that he is not; this presumption of law, in favor of the certificate, stands for evidence for the sitting member at every point of the testimony, nothing having been shown to change the burden of proof in any particular. It must be conceded, then, in the absence of proof to the contrary, that the chairman of the selectmen, with the concurrence of his colleagues, was justified by the usage of the town, and the presumed assent of the voters, in holding out the ballot-box, and calling for votes, on the second ballot, without any previous vote of the meeting to proceed, and that he did this fairly and honestly, in the ordinary course of business, and with a single eye to his duty. It is shown by the testimony of the principal petitioner, Mr. Loring, who made the motion not to send, which has occasioned the petition, that that motion was made immediately after the chairman called for votes; and it appears to the undersigned, to be abundantly proved, that the votes of Mr. E. S. Wright, and Mr. T. D. Ellis, were put in instantly upon the making of this call, and before the motion of Mr. Loring had fairly reached the apprehension of the selectmen. This fact is testified to by the two voters themselves, by Mr. Bisbee, the selectman, who says he checked their names; by Mr. Charles B. Wright, who says he tried to vote immediately after them, and was prevented by the chairman, (who held the box out of his reach, and said there was a motion to adjourn,) and by several bystanders, and there seems to the undersigned, to be no ground whatever for imagining, that these votes could have been put in after the decision of the selectmen, that Mr. Loring's motion was out of order. The fact, that many of those present did not see the votes deposited, can hardly be said to weigh against such positive testimony as this. The undersigned submit the foregoing, as in their judgment, the only theory upon which the testimony, which was doubtless honestly given, and is wholly unimpeached, can be made in any degree consistent with itself; and they add, that even if this theory be not supposed to be absolutely made out, it certainly is not disproved by the testimony; which latter re-

sult is as good for the purposes of the argument, as any; it being necessary for the petitioners to disprove it beyond a reasonable doubt. Though the evidence conflicts considerably upon the question of the order of motions, and the disposition made of them after the call for the second ballot; it seems to the undersigned, that a motion to adjourn to the next day came after the motion of Mr. Loring, and was put and negatived; that a motion to dissolve was then made, and the affirmative side of it only was put; and that then Mr. Loring's motion was first regularly noticed by the selectmen, and, after discussion among themselves, and some remarks from some of the voters, ruled out of order; whereupon several voters, much less, however, than a majority, left the meeting, and then the balloting proceeded, at which Mr. Nye was elected.

It thus appears to the undersigned, that the petitioners have wholly failed to make out their case. If it shall not appear to the house, that the holding out of the box, accompanied by a call for votes, was of itself sufficient to make a subsequent motion improper, (that call, so accompanied, being in the nature of a full question stated, like a question to be taken by yeas and nays, of which the affirmative and negative are simultaneously put, and after which, no motion is in order,) yet the deposit of the two votes, or of a single vote, though co-instantaneous with the motion not to send, settles the question in favor of the sitting member, as the right of one voter to put in his vote, after the chairman's call, was certainly as good as that of another to make a motion. The chairman of the selectmen has no recollection of admitting these two votes; he appears to have been in a state of great agitation at the time; but it appears that while he had not yet noticed Mr. Loring's motion, the other two selectmen, at least, had noticed the two voters, and allowed the votes to go in. Mr. Bumpus, the third selectman, confirms the testimony of Mr. Bisbee and the rest, as to the vote of Mr. E. S. Wright, and thus it certainly appears in the highest degree probable, that that gentleman's vote went into the box, while Mr. Loring was yet speaking, and the vote of Mr. Ellis immediately afterwards, before

the selectmen could have taken notice of the motion. It was clearly an irregularity, to put the motion to adjourn, and clearly right, not to put the motion to dissolve, whether the balloting had commenced or not; because the law distinctly requires the selectmen to seal up the record of certain votes, previously thrown at the meeting, and then not sealed up, before any adjournment, and a motion to violate the law is necessarily out of order.

It appears obvious, that no actual injury has been suffered by this refusal of the selectmen, to put the question on the motion not to send. If those who desired to vote in the affirmative were the majority, they could gain their object with but slight trouble by depositing their votes; if a minority, they would lose it in any event. If any of them choose to retire from the meeting in wrath, or congratulating themselves upon the strength of their technical ground, they must take the consequences of their error, whatever they may be. It will hardly be maintained, that an error of the selectmen is to be magnified by the views which a portion of the voters may choose to take of it, and by the steps they adopt in consequence. A voter, certainly, ought to have no more weight out of the meeting than in it, and it cannot be held that fifty voters, by leaving the meeting, can nullify the acts of a hundred who remain.

The undersigned have no doubt, that if their view of the result of the evidence is taken by the house, the sitting member will be confirmed in his seat. But they do not leave the case here. On the contrary, they are prepared to maintain, that upon the very state of facts set up by the petitioners, the member has a right to his seat.

They will admit, for the further purposes of this argument, that the motion not to send was made and seconded at a proper time, and ruled out of order by the selectmen. And they contend, that even upon this hypothesis, to deprive the member of his seat would be contrary to the clear fundamental policy of the commonwealth, and to the weight of established precedent and law.

As the argument would be similar, upon the ground that

sufficient time was not given to make the motion (in the absence of fraud), to the argument upon the question above stated, that point is here dismissed.

There is no imputation of fraud in this case. The selectment were acting fairly, and endeavoring to do their duty. The question, then, is this: Is the neglect or refusal to put a motion not to send a representative, regularly made and seconded, sufficient, of itself, to invalidate an election subsequently made? The fact that the chairman gave an unsound reason for not putting the motion is of no consequence. The question is not of what he said or did not say, but of what he did, or refused to do.

The fault, then, for which the town is said to deserve to lose its representative, was an error of judgment on the part of the chairman of the meeting, on a question of parliamentary law, applicable to his duty at the time. Now, the undersigned think it clear, that the house, in its capacity of a court, which settles the law relating to cases of elections, is bound to lay down for the towns certain clear and fundamental principles; not to frame a nice and technical system, but merely to inculcate those rules of common law, or, what is the same, of experienced common sense, which underlie the whole law respecting public meetings, and which have obtained with the Anglo-Saxon race, from the earliest times. These principles are few, and of universal application and recognized utility. The first is, that there must be a presiding officer; the second, that there must be a recording officer. These are already provided for in the case of town-meetings, by statute. Next in order come these three; that only one thing can be done at one time; that whatever is proposed to the meeting for its action must be proposed through the chair; and that the meeting must control the chair. There is nothing in these too nice for ordinary use, and these, it seems to the undersigned, ought to be recognized by the house, as being, what in fact they are, a part of the common law. To apply these principles to the present case; the chair, as is admitted, for the sake of the argument, ruled incorrectly on the point of order; the voter who made the motion had the right

to appeal to the meeting, and was bound to do so, for this, among many more obvious reasons, that the chair was promulgating for law what was not law, and misleading the general mind. The chair necessarily ruled hastily, and if an appeal had been taken, the wisdom of the meeting, expressed in debate, would probably have enabled the chair to correct its error, and to give a deliberate and sound opinion, after argument. If otherwise, the meeting would doubtless have overruled the chair, or, if it did not, it would be justly responsible for the error. The voter in this case, not having appealed, has waived his right, and it does not lie in his mouth, nor in that of those who joined in this legal acquiescence, to complain of the consequences of his own error. It may be said, that it will not do to adopt any, even the easiest and most fundamental principles of parliamentary law, for the government of town-meetings. Will the house then invalidate the town's elective franchise for a year, and that a most important year, because the officers of the town have ruled incorrectly on a point of parliamentary law, so abstruse, that the opinion of the justices of our highest court was needed to inform the house of representatives, that its previous judgment, which had been identical with that of these selectmen, had been erroneous? Will the house hold a presiding selectman, or a board of selectmen, to know accurately, and to decide correctly, at ten minutes' notice, in the confusion of a town-meeting, a point of law of that sort, when the decisions upon it date back at least thirty years, and are only to be found in a rare book, now long out of print, (the Reports of Contested Elections,[1]) and with which few, even of the class of statesmen or that of lawyers, are in any degree familiar? The undersigned humbly but very confidently answer these questions in the negative. It may be urged, that the practice of voting not to send is familiar to those towns, which send less often than once in every year; but then the question, whether the town will send this year or the next, is a totally distinct one from the question, whether they will neglect their clear duty, to send at a

---

[1] Reprinted in the present volume.

time when, (as in this case,) they may send without prejudice to their rights or interests, in any subsequent year.

It may be further urged, that the selectmen acting at elections are officers of the law, and, so in certain particulars, not under the control of the meetings over which they preside. If this be not so, then the previous argument applies; if it be so, how can it be held that the towns should suffer for their error? If the fault be serious, the selectmen should be punished in their own persons. If there be now no law to punish them, a law can be made for future offenders in the like kind, and it is not the fault of the town of Plympton, that it does not now exist.

It appears to the undersigned, also, that it is the duty of the house to encourage in the several towns a candid, liberal and earnest mode of transacting their business at elections,—not a small and hair-splitting method,—and where a minority is found to aim at carrying its point by a trick of special pleading, rather than by an honest endeavor to convince and convert, or to out-vote its opponents, that course certainly is not to be favored.

It further appears very clearly, that the object of the constitution is, that the people shall be represented in the house, not that they shall vote not to send. This point might be labored at great length, but the argument is too obvious, and has been too often reiterated, to permit the undersigned to do more than to allude to it, so far as it bears on the question of the true policy of the house in the premises.

The last point, to which attention is desired, is this, that the weight of precedent is in favor of the sitting member.

The fundamental law on the subject is, of course, the constitution. In that instrument, chapter 1, section 3, article 2, it is provided, that the towns may send representatives to the general court, in certain modes and under certain limitations, and further, that the house of representatives shall have power, from time to time, to impose fines upon such towns as shall neglect to choose and return members to the same.

These provisions, of course, import at once a privilege and a

79

duty, and upon the principles of law as generally understood, it would seem that a motion not to send a representative, being a motion that a town deliberately resolve to neglect its plain duty under the constitution, would be out of order, and that an affirmative vote upon such motion would be illegal and void. And this was the original construction adopted by the house.[1] But some years afterwards, (Feb. 16, 1811,) in answer to an order of the house, requiring an opinion on a wholly different subject, the justices of the supreme judicial court say, merely as a passing remark, not particularly connected even with the argument on the question before them, as follows :—

' The right of sending representatives is corporate, vested in the town, and the right of choosing them is personal, vested in the legal voters. Because the right of sending a representative is corporate, if the town, by a legal corporate act, vote not to send a representative, none can be legally chosen by a minority dissenting from that vote. This corporate right is also a corporate duty, for the neglect of which, a fine may be assessed and levied upon all the inhabitants liable to pay public taxes.'[2]

Subsequently to this, the case of Roxbury, 1813–14,[3] was decided, in which the refusal to put a motion not to send, or its equivalent, was only one of many substantial grounds on which the election was invalidated. The committee, in their report on this case, speak of ' a decision of the supreme judicial court' on this subject, (as distinguished from the practice of the house,) as ' fixing the established law of the land.' They doubtless refer to what has just been quoted, which is a mere passing remark, and not a ' decision,' nor even an ' opinion.' And the undersigned will say here, with reference to the opinions hereinafter quoted, that it requires no lucubrations of twenty years' duration, to know that an opinion of the justices, in answer to a question from the house, however delib-

---

[1] Westminster, 1790–1, *ante*, 32; Topsham, 1802–3, *ante*, 43.

In the Westminster case, the memorialists say :—"The principle held out and acted upon, that every town has a right to vote they will not send a member to the general court, strikes at the very nerves of the constitution, and throws the people into anarchy at once."

[2] Ante, 120.          [3] Ante, 157.

erately given, and however responsive to the question, is only the opinion of so many able lawyers, given, too, without their having heard arguments, and is in no respect law. It is not 'a decision of the supreme judicial court.' It is a mere 'opinion,' and the undersigned deem it at least questionable policy, on the part of the house asking the question, to shift from its own shoulders, itself being the legitimate expounder of the constitution, the burden of making the exposition. It is never well to seek to divide responsibility without absolute necessity. And certainly, there was no such necessity here. The house was perfectly competent to decide the question. It contained, as always, men of great ability. The question related to its own privileges. It has always, since the famous 'Speaker Thorpe's Case,' in the reign of Henry VI.,[1]—in the country

---

[1] Thomas Thorpe, who was speaker of the house of commons, in the 31 of H. VI., was sued by Richard, duke of York, during the recess of parliament, in the exchequer. The plaintiff obtained a judgment and execution, upon which Thorpe was arrested and committed to the Fleet prison. When the parliament met, after the recess, the whole house of commons presented a petition to the lords, for the enlargement of their speaker. The lords, thereupon, as appears by the record, "not intending to impeach or hurt the liberties and privileges of them that were commons for the said communalities of this land to this present parliament, but legally, after the course of law, to minister justice, and to have knowledge what the law will weigh in that behalf, opened and declared to the justices the premises; and asked of them, whether the said Thomas ought to be delivered from prison, by force and virtue of the privilege of parliament or not. To the which question, the chief justice, in the name of all the justices, after sad communication, and mature deliberation, had among them, answered and said :—That they ought not to answer to that question ; for it hath not been used aforetime, that the justices should in anywise determine the privilege of this high court of parliament; for it is so high and mighty in this nature, that it may make law, and that that is law, it may make no law ; and the determination and knowledge of that privilege belongeth to the lords of the parliament, and not to the justices : But, as for the declaration of proceeding in the lower courts, in such cases, as writs of *supersedeas* of privileges of parliament be brought and delivered, the said chief justice said, there be many and divers *supersedeas* of privilege of parliament brought into the courts ; but there is no general *supersedeas* brought to surcease all processes ; for, if there should be, it should seem that this high court of parliament that ministreth all justice and equity, should lett the process of the common law; and so it should put the parties complainant without any remedy, for so much as actions at common law be not determined in this high court of parliament; and if any person, that is a member of this high court of parliament, be arrested in such cases as be not for treason or felony, or surety of the peace, or for a condemnation had before the parliament, it is used, that all such persons should be released of such arrests, and make an attorney, so that they may have their freedom and liberty freely to intend upon the parliament." The lords, upon this answer, resolved that Thorpe, "according to the law," should still remain in prison for the cause stated ; "the privilege of parliament, or that the same Thomas was speaker of the parliament, notwithstanding ;"

whence we derive those principles of parliamentary law, which have, in a high degree, made England and America what they are,—been thought improper to ask the opinions of the justices on points of privilege, and the consequences of having asked and received this opinion are in no respect valuable.

On the contrary, those consequences are, that, whether the house, which first asked the opinion, supposed that, as usual, the justices of that court meant something more than they said (whereas in fact they had gone to the very outmost verge of construction); and acted upon the ground, that the opinion, that a town had a right to vote not to send, implied that that right ought to be exercised and encouraged; or whether it thought that temporary grounds of expediency justified its course, it certainly proceeded to offer a premium upon that motion, greater than was allowed to any other; and the result is, that the decisions upon this point, blazing with their own singularity, and with the borrowed lustre of the opinions of the justices, stand out like beacons in the sea of law; but in the opinion of the undersigned, it is better to sail away from them, than towards them. There are dangerous rocks where they stand.

But to retrace the argument. Next to the Roxbury case, came that of Nantucket, in 1814–15, (*ante*, 180,) where there were other substantial circumstances also to govern the decision of the house, besides the neglect of the motion not to send, and among those circumstances was the reading of the riot act, and the dispersion of the meeting by the sheriff.

In the next year, were the twin cases of Nantucket and Sharon, (*ante*, 195,) pending the decision upon which, the opinion of the justices was asked upon the question, whether a town could legally vote not to send a representative, so that that vote should bind a dissenting minority. The justices, in

and that the commons should be commanded, in the king's name, to proceed to the election of another speaker, "with all goodly haste and speed."

The reasons assigned by the judges, for declining to express an opinion on the question of privilege, though probably true at that time and long afterwards, namely, that privilege is not defined by law, but is whatever the house, in their discretion, may choose to make it, would not be generally admitted, at the present day, in England, and certainly does not, if it ever did, exist in this country.

their reply,[1] referred to the above quoted passing remark of
their predecessors, and confirmed the doctrine therein convey-
ed; laying some stress on the fact, that the house was not ab-
solutely required to impose the fine in question.   This opin-
ion, though, of course, it received from the undersigned all that
high respect which was due to its source, yet excited in their
minds some surprise, as it clearly goes to the point of saying,
that a town has a right to neglect its duty deliberately, if it
is willing to incur the risk of a fine.

This surprise was somewhat lessened by the perusal of an
opinion of Mr. Justice Preble, of Maine,[2] given at its request,
to the house of representatives of that state, in 1826, on a
question of a similar character to the one under consideration,
and which the undersigned quote, as the opinion of a distin-
guished contemporaneous lawyer and judge, who may well be
supposed to have understood whereof he spoke.   He says,
speaking of the *dictum* of 1811 : ' It was a construction, op-
erating as a check to a growing evil, the increasing number of
representatives.'   This seems to show the ground on which the
justices, as well as the house, felt justified in their opinions on
this point.   This opinion of Mr. Justice Preble, the undersign-
ed think it not irrelevant here to state, was a dissentient opin-
ion, concluding that under the constitution of Maine, a town
had no right to vote not to send a representative ; and though
the constitution of Maine differs slightly from our own,
(among other differences, it has no provision for a fine upon
towns not sending); and his opinion is predicated upon the
ground, that the word ' corporate' is studiously excluded from
the former, and that of consequence, the right to send a repre-
sentative belongs to the individual voters ; yet the fact that the
legislature of that state adopted his opinion, and rejected that
of his two associates, shows that their view of public policy
sustains the ground taken by the undersigned.

Asking pardon for this digression, the undersigned proceed
to say, that the case of Nantucket and Sharon was decided

---

[1] Ante, 198.            [2] 6 Greenleaf's Reps. App. 496.

against the sitting members, and that similar decisions were made in the Boston case in 1818–19, (*ante*, 221,) and in the Charlestown case in 1819–20, (*ante*, 226); and these three cases are those on which, and on which alone, it is believed, that the case of the petitioners rests. It was probably thought advisable by the house, at that time, when its numbers were growing formidable even to itself, to promulgate this new doctrine; and having done so in the case of these two small towns, it seemed highly expedient to do the same with the two large ones; particularly as they were at the very base of the capitol, and for that and other obvious reasons, were in an especial manner bound to recognize the first decisions. It is not supposed, that these cases were intended as precedents, but that they merely arose out of what was deemed a temporary expediency. The justices, in their opinion in 1815, lay great stress on the fact, that the towns were obliged to pay their own representatives, and that therefore the minority could not lay that burthen on the town; and they allude to the fact, that those qualified to vote in town affairs, and who could vote on the question of whether a representative should be sent, were a different body from those who were qualified to vote in the election of the representative. These grounds for their opinion have ceased to exist.

The house, again, may well be supposed to have acted with reference to the desired diminution of its own members. The evil thus sought to be corrected has also ceased, though the undersigned willingly admit, that this last argument might be pressed at a more favorable time than the present.

It may also be remarked, that in all the decisions on this point, the refusal to put the motion occurred at the opening of the meeting, and it would be going a step beyond any of them to unseat the member in this case. If this voting not to send has been deemed a valuable medicine, it has never been held, that the selectmen were bound to give their patients more than one opportunity to ask for it on the same day. But the undersigned gladly remark, that the decisions on this side stop here in 1819–20. There is no new law on the subject on this side.

On the other hand, in the convention of 1820–21, for revising the constitution, the same question arose and was decided in the opposite way.[1] There it appeared that the town of Charlestown had, at the opening of their meeting for the choice of delegates to that convention, voted to send six; that only five were chosen at the first balloting; that a motion was then made, to reconsider the first vote so far as the sixth was concerned, which the selectmen refused to put; and that the balloting was then resumed, and resulted in the choice of the Hon. Leonard M. Parker. Upon this state of facts, the convention voted that the election was valid, and Mr. Parker held his seat. Though the form of the motion in this case is slightly different from that in the cases on the other side, yet the meaning is identical in all; and though the case is not strictly an authority, yet a decision of the most illustrious sons of the commonwealth, on a question where all those cases were quoted, is entitled to, and will doubtless receive, its due weight as an opinion. It is not imagined that any feeling of *esprit du corps*, or pride of opinion, on the part of any member of this house, will prevent it from weighing as much as a similar decision of the same men assembled as a house of representatives.

The undersigned consider the question now standing as a new one, with decisions on both sides, some of the earlier and the last on their side, the intermediate on the other. But they find, that in the case of the Adams election in 1836, (*ante*, 339,) a motion was regularly made, and seconded, (under circumstances, too, which rendered it reasonable,) to adjourn to the next day; that the selectmen refused to put it; that the committee on elections of the house, on the authority, doubtless, of the decisions above cited, reported the election void; and that the house, though of a political complexion different from that of the two members, rejected the report, and took no further action upon the subject; which was precisely equivalent to a vote that the members were entitled to their seats. There is some ground for supposing, that the zeal of the minority of

[1] Journal of the Constitutional Convention, page 36.

the voters in that case led them to behave somewhat factiously in the meeting, and afterwards in retiring from it nearly unanimously; but the case goes to this point, that where the selectmen mean fairly and honestly, a mistake of their duty in regard to the putting of a particular motion, regularly made and seconded, is not sufficient to invalidate the election subsequently made on the same day. This case, in the opinion of the undersigned, entirely covers the present, unless the house is going to hold, at this late day, when the reasons for those old decisions have entirely failed, what was never held in the palmy days of those decisions, that this motion, in derogation of duty, is entitled to greater consideration, than a motion tending to forward the public business, or indeed than any other motion whatever.

It is a customary remark among uninformed persons, that the decisions of the house, upon questions of elections, are loose and irregular. It will be found upon examination more correct to say, that they have been regularly lenient.

In reviewing the course of decisions, upon cases in any degree analogous to the present, from the adoption of the constitution to the year 1843, (farther than which, the undersigned have not extended this particular inquiry,) only *ten* elections have been held void, in cases controverted on the ground of irregular conduct of selectmen. Among those which have been sustained, are found repeated cases where selectmen have violated most important parliamentary rules; and even the most express and valuable provisions of statutes, of remote as well as recent date, with reference to the time of violation; and the conclusion therefore presents itself, that unless the refusal to put this particular motion, that the town neglect its duty, be held a more heinous offence than any other which it is within the capacity of a selectman to commit, the member from Plympton is entitled to his seat, even upon the state of facts assumed to exist by the petitioners themselves.

If it be said, that this part of the defence stands upon technical grounds, it is replied, that the point presented by the petitioners is purely technical. A legal argument upon a point of

law should be answered by a legal argument bearing upon the same point.

Finally, the undersigned repeat, that if their view of the facts in the case be deemed the correct one, or if it be not affirmatively shown to be incorrect, so as to rebut the presumption of law, then it must be admitted that the election was valid. If, on the other hand, the view of the facts taken by the petitioners be deemed and taken to be established beyond a reasonable doubt, even then, to hold the election void would be, in their deliberate judgment, to violate the plainest principles of public policy, and to re-establish the authority of unfortunate precedents, the reasons for making which have ceased to exist, and which may fairly be considered as wholly overthrown by subsequent decisions.

The undersigned can therefore only arrive at this conclusion, that the member from Plympton is entitled to his seat, and that the petitioners have leave to withdraw their petition."

The report was amended, by striking out the concluding paragraph, and substituting therefor the conclusion stated by the minority; and the report, as amended, being agreed to,[1] it was accordingly—

Resolved, That the member returned from Plympton is entitled to his seat, and that the petitioners have leave to withdraw their petition.

[1] 73 J. H. 549.

80